3-11-0129 Smith v. Hanson, et al., non-exceptional court. This is Midwest Urological Group v. Smith, et al., and it is the clinical pictorials and students' watch. It was very much set out by both parties with respect to the operative facts, respecting the care that was given and the testimony that was provided. I think the biggest issue, and there was a number of issues that we had on appeal, however, I'd like to point out one of the primary issues, which respects the corroborative testimony of physicians other than urologists and surgeons that were done in this case. This case was filed against two doctors specifically, a surgeon and a urologist. Therefore, the standard of care testimony and all the evidence respecting standard of care would respect those two physicians and those two specialties specifically. What happened here was the defense determined that this would be a case and set up a blueprint where there was a team approach that they tried to put on the jury to say that this is a team approach and that other specialists were involved and the other specialists somehow and their standards of care and whether they did the appropriate measures for conservative care were appropriate. However, this is not a case where we sued the hospital other than for vicarious liability respecting Dr. Haywood. This is not a case where we sued all these various specialists for any deviations from the standard of care for gastroenterologists, interventional radiologists, or anybody else. This case comes down to a blueprint that the defense put together  to bar any testimony respecting standards of care outside of the surgical standard of care and the urology standard of care, and we were not granted that motion with the exception of Dr. Slagle, I believe, who was kind of peripheral to the whole issue. The blueprint that the defense took was to use the testimony of other treating physicians and specialties other than general surgery specifically to bolster their arguments that the appropriate things were done by Dr. Haywood and the conservative measures, which were actually a default position, were appropriate. Their blueprint, if you read the Kim case, which I think is the most instructive because it's almost a carbon copy of what occurred in this case. In Kim, there was a case against a radiologist for allegedly failing to appropriately read a radiology film that resulted in damages to the plant. In that case, the radiologist testified that he had gone around to other radiologists within the hospital and asked for their opinions about their impressions on the various radiology films, especially the one that was at issue. The court determined that using this corroboration testimony should not be allowed. And specifically, what happened in that case is the defense counsel used what's called what I would term a safety in numbers approach to try to bolster their case by saying that other physicians agreed with or went along with the standard of care of the particular physician at issue. Specifically, if you look at Kim v. Nazarian at page 433, and the citation is 576 N.E. 2nd, 427, and at 433, the defendant's closing argument is set forth. In that closing argument, the defense counsel stated, if you take that common sense fact that you have two against six, and what they were referring to is there were two physicians on the plaintiff's side who had rendered opinions respecting the standard of care and six on the other side, and if you come back to the burden of proof and say, did they prove it? Did they prove it to you? Did they convince you that it's more likely true than not that these x-rays were abnormal? Ladies and gentlemen, the only way that you can give a verdict for the plaintiffs is if you say that all the people, all six of those doctors, are either grossly incompetent or came up and lied to you. So the court specifically said that the central issue on appeal was not these corroborating testimony, but rather was the standard of care of the physician at issue. The court determined that based on the use of these other corroborating testimony and use of this safety in numbers approach, the court said the question of, and this is at page 435, moreover, the defense attorney highlighted the corroborative testimony in his opening statement, and he also emphasized in his closing argument that more experts agreed with the defense position than the plaintiffs. Finally, we note that the question of whether Linda's 1982, that's the plaintiff, x-rays revealed an abnormality was in reality the only issue in the case, and the testimony of the experts on both sides was central to the resolution of this issue. The court said, we conclude that the record does not affirmatively demonstrate that the improperly admitted testimony was not prejudicial to the plaintiffs, so the error is not harmless. Accordingly, the plaintiffs are entitled to a new trial. This is the blueprint by which the defendants used for this case. In the closing argument that's at record at page 1658, defense counsel for Dr. Haywood stated, good physicians, 10 or 12 or 15 of them, were not able to prevent the death. At page 1661, he states, it is Dr. Velez alone against Dr. Haywood, and I would argue to you against Dr. Haywood and a whole array of other physicians. Goes on to say, do you believe Dr. Haywood and all of the physicians who essentially reached the same conclusion that he did, or do you accept Dr. Velez over all of that? On page 1664, during the closing argument, there was a chart used. The statements and the arguments were about this. During the course of this trial, the issue, and the only issue with respect to Dr. Haywood, is whether it would have been a good idea to operate on the pancreas at any time. The essence of that is that's true, and whether to operate on the pancreas at any time is a surgical decision. And despite our arguments to the contrary, the court allowed testimony from gastroenterologists and other conventional radiologists, both treating and expert, to say that, yeah, this is the way we do it. Conventional way is the way to go. I would agree with what Dr. Haywood did. This is the way that it should be done. But that's not true. The standard of care at issue here is the standard of care for a general surgeon, not for these other specialties. He goes on to say, counsel, in the closing argument, I believe that two on the left side, he has this chart up in front of the jury, two on the left side would say it would be. In other words, there was two experts from a plaintiff that said it was a good idea to do surgery. One expert was Dr. Velez, our retained expert, and then Dr. Paulson, who actually did the surgery that should have been done about a month earlier, and tried to save the patient too late. I believe everybody else on the right, either by direct statement or by implication, said, don't operate on the pancreas. Goes on to say, ask yourselves with respect to this definition of what malpractice is, are the only reasonable physicians in this case on the left side of the column, meaning the plaintiffs? On this issue of surgery, whether surgery should have been done on the pancreas, are they right, or are all the physicians on the right side of the sheet paper wrong and outside the standard of care? So there's this blurring of distinction of what is the standard of care for the surgeon. The plaintiff was left with a situation by which we couldn't really defend them. The plaintiff had an obligation and a burden to show the standard of care for a reasonably well-qualified surgeon practicing in Peoria at the time. We brought forth an expert in that regard. The defense had its own expert in general surgery, as well as the defendant himself, and another surgeon, Dr. Patel, who was involved in the case. And during the course of his treatment of the patient, it was basically one consultation subsequent to the time when we alleged that the surgery should have been performed, said that the surgery shouldn't be necessitated at the time because of the patient's deteriorating condition. We did not, however, have interventional radiologists. We didn't have gastroenterologists. And essentially it was a piling up of other specialties to present to the jury the argument I just read to you that says we've got all these people and they only have two. Our people are teachers, their people are not. The question is really about whether or not the standard of care is an issue and whether the standard of care for a general surgeon is an issue rather than all these other people. It would be different entirely if we were suing the hospital for the wrongful death of Mr. Hansen based on the collaborative effects or the collaborative care or anything like that. We did not. It was about the surgeon's care specifically, and we tailored our case to that effect. In addition to that, the case law indicates that if you look at the Dolan case and the Sullivan case, they set forth the criteria by which the steps that the court should go through to determine whether expert testimony, be it retained experts or treating experts that are experts in their field, should be allowed in a case such as this. The three steps are licensure, which the defendants harp on quite a bit, which is really not the standard. The licensure is just the one threshold requirement. Familiarity is the second one, which is much more important in this case because the standard of care and the testimony respecting the standard of care requires that they lay a foundation that the physician that's going to be testifying about it is familiar with the surgical, in this case, aspects of the case. While it's true that gastroenterologists do treat pancreatitis and do treat pancreases, that was not the issue in this case. They did not ever satisfy any of those threshold requirements, nor did they show that any of these witnesses were competent to testify in the area of the standard of care for a reasonably well-qualified surgeon. And there's, important also to this, to your consideration, I would respectfully ask the court to look at the Dolan case at 77 Illinois 2nd, 279, and these have all been cited in our brief. And one of the, it's important, and this indicates another two-step process for the foundational requirements for an expert to testify. In addition, there's a notation and a holding in here that indicates this is a case where there's a podiatrist against an orthopedic surgeon, and the court said that they can't, they don't, they're not the same school of medicine, they're not the same specialty, so they can't be testifying against each other, essentially. The court said, no one person, group, or school has yet succeeded in abstracting a universal medical method from the many changing methods used in science and medicine. In other words, they're saying that one physician treats one aspect of a patient and another treats another, and they don't necessarily mesh together. And that's where those foundational requirements from Dolan and its progeny come forth. Sullivan and a number of the cases that we cite all stand for that proposition, that these people are not qualified to testify like that. Thank you. These are the primary issues in this case in terms of the appeal. I'd also like to point out to the court the numerous statements made within the defendant's brief that also support this. One of the areas, the fact that none of these physicians are urologists or surgeons does not affect whether they are qualified to testify or render opinions. That's completely false. They can render opinions, they can render factual opinions about what they did and how they treated this particular patient. But when they say, we did it the conservative approach, and they were asked countless times, Dr. Penn, Dr. Wu, who didn't even testify, was brought into this, we objected timely to most of this, and it got to the point where it was so overwhelming that objections became kind of fruitless, that these people were testifying, would you have done surgery? Did Dr. Wu recommend surgery, gastroenterologist, Dr. Penn? No, no, no. Well, as it turns out, they can't recommend surgery. They're not surgeons. It's like in everyday practice or just in everyday life. You sprain your ankle, you go to your internal medicine physician, you say, boy, my ankle really hurts. The internal medicine physician will look at it and say, well, it's pretty swollen, it doesn't look like it's broken, but I really can't be sure. The best thing you should do is why don't you go see an orthopedic surgeon, and the orthopedic surgeon will handle it. That's essentially what's going on here. While these people may treat pancreases and may do procedures respecting pancreases, they're not licensed in the same school of medicine, they're not qualified in the same school of medicine as a surgeon who could render opinions respecting the standard of care. So in closing, Your Honors, this safety numbers approach that was specifically rejected and required a reversal for a new trial in Kim versus Nazarian should be the same decision in this case. Thank you. Is it Mr. Pretorius? Yes, ma'am. I understand you're going to take the first ten minutes and then reserve five for Mr. Swilford? Yes. You may proceed. Your Honors, I'd like to start with the Kim versus Nazarian case and tell you that it offers no support for the plaintiff's position. It is totally inapposite on its facts to our case. In the Kim case, the defendant had hired an expert to interpret a radiological film. There were no treating physicians involved. That's what we have in our case. That expert that the defendant retained, off at his own hospital, consulted with other radiologists on his staff who had nothing to do with the case at hand, were unknown by name even, then came into trial and said, I have a number of people who agree with my interpretation. That is nothing like we have here. In this case, we have five or six people involved in treating a condition, a pancreatitis. That is the medical issue in the case. It is not a surgical standard of care. It is how you treat a pancreatitis. Every physician about which he complains was in the case with firsthand knowledge, completely different than the Kim case, who were giving their opinions either in the record, which records were admitted at trial without objection. There is no hearsay problem with any of this. The consultant's reports were evidence before the jury, shown to the jury, read to the jury, argued to the jury. And they were all treaters? All treaters. We hired two experts. They hired two experts. My primary co-defendant, there's four defendants here, but we always treat them as two primary defendants. There's two primary defendants and two alleged employers. The truth of the matter is, and it's in our brief, there is more than ample foundation that all of these specialties deal with pancreatitis. All of these specialties, interventional radiology, gastroenterology, surgery, and infectious disease, they all treat pancreatitis. Pancreatitis is a nasty condition. The pancreas can be disturbed in any manner, and there is differing approaches as to how you treat it. The question I would ask the court is, with this record of treating doctors recommending against surgery, with lots of testimony that surgery can further aggravate and inflame an already bad situation, had Dr. Haywood gone ahead and operated and the patient died, would this court say that all of those firsthand opinions of treating physicians, that surgery is not the way to go, that that would be somehow irrelevant or immaterial? There is more than adequate foundation in the record from physicians who testified, that physicians consider each other's opinions. It wasn't just, do not operate on the pancreas. Two of these physicians said, I have a better way. Dr. Wu stented it. Now, a stent is very much like it is in the cardiac area. It's an alternative to open-heart surgery. In this area, it is an alternative way to treat the pancreas. It is considered less invasive, less harmful to the pancreas. Dr. Wu placed a stent, and the patient seemed to get better for about 10 days. That's very clear. So surgical standard of care is not at issue here in the strictest sense. He didn't do surgery. He didn't do anything surgical. What was at issue here is what is the best disciplinary way to approach this problem. Is it the means and methods of gastroenterologists? Is it the means and methods of interventional radiology? They used both here. Or do you go in and cut off part of an inflamed pancreas? That's what they were trying to convince the jury. So the Kim case, again, has no application. This is a retained expert who went and consulted with unknown experts in his department of radiology that may have been thousands of miles away from me, and they looked at a specific radiology film. Then he comes in and reports what they all said. That was a manufactured safety in numbers. The safety in numbers, and of course we used that argument. There were so many people from different disciplines that had seen this man, had evaluated this man over time. Now he complains that it's cumulative. It is not cumulative. They're different specialties, different perspectives. They are not talking about the same point in time. For example, Dr. Pan saw the patient for seven days before, consistently before Dr. Haywood was even on the case. Then Dr. Wu came into the case to cover another period of time. Of course we brought his testimony in. He didn't testify. His full consultation report was admitted and dealt with many times. Another one that testified was Dr. Slagle, infectious disease. His opinion was he was too sick to have surgery. Another one was the interventional radiologists. What they contribute to this is to put little tubes in, much less invasive than surgery, and drain out these harmful chemicals that the pancreas puts out, which allows things to heal. The stent is designed to allow a weak spot in the pancreas that has weeped these fluids to heal. There's all kinds of testimony as to how caustic and acidic these fluids are. It's what allows us to digest foods and break up foods. When it gets outside the pancreas, outside the gastrointestinal system, it burns. So never was the standard of care of a surgeon as such in question. And if you look at the issue instruction, there are two allegations against Dr. Hayward. Each says he failed to perform surgery, not how he performed it, not any surgical decision-making. The record is replete with testimony from gastroenterologists that we do things and sometimes we have to turn it over to surgery. Interventional radiologists, testimony of the same thing. We do things, sometimes we have to turn it over to surgery. So the strength in numbers, absolutely. It's seldom that you see a case where this many people from this many different disciplines said surgery, not only that surgery is not the proper course, but that in several instances, I have a better course. And that course was followed. I think this is all clearly laid out in the briefs, and I thank you for your time. This case should be affirmed. Is it Swofford? Good afternoon, Your Honors. I represent Midwest Urological Group, which was the principal of Dr. Stanisek, the urologist who performed the original nephrectomy. Normally, Mr. Hughes, who represented Dr. Stanisek, would be here, but he did not want to cancel his vacation and we didn't want to ask the court to move the argument. So I'm sorry to stand in for the Stanisek side of the case. And I should acknowledge that Kevin Taught from Mr. Hughes' office is here, and so is Greg Unrath from the other defendant at Methodist Medical Center. I didn't hear counsel when he was up here say anything about Dr. Stanisek. Or about the case against him. And it's sort of hard for me to understand why he even pursued Dr. Stanisek in his briefs since when he got the record together in this case, he didn't even include his expert who testified that Dr. Stanisek breached the standard of care. And I think this was a very well-tracked case, and Judge Corey made a lot of correct decisions, all of which were in his discretion, and he didn't abuse his discretion. But even if that was not the case, there's really nothing before the court with regard to Dr. Stanisek or Midwest Urological to review, because even if there are errors in a case, there has to be prejudice. And in the absence of any testimony in this record that Dr. Stanisek breached the standard of care, I can't see where the plaintiff is going with the appeal against Dr. Stanisek. There are a number of other issues in this case. If the court has any questions about them, I think the plaintiff covered the main ones, and Mr. Pretorius gave a good answer to all those arguments. But that's really all I have. There doesn't appear to be any questions. Thank you very much. Thank you. And Mr. Borth? Yes. Do I have some time left? Oh, five minutes. Thank you. Did we catch you off guard? Yes, I'm sorry. You thought you were done? No, I thought I was done. Thank you. I'd just like to add, in terms of what Mr. Pretorius was indicating, that the surgical standard of care is not an issue in this case. It definitely is. This is the case against the surgeon. So the surgical standard of care, and whether to do surgery or not do surgery, from a surgical standpoint, was what was an issue in this case. And as he just pointed out in our issues instruction, our primary issue as to Dr. Haywood was the failure to timely perform surgery. And that's because what he did was, on the 17th of September, he did an exploratory laparotomy, which is basically opening up the abdomen and exploring, because at that time there was leaking pancreatic fluid, there was blood in the abdomen, there were a lot of issues going on, in addition to the bowel problem that Dr. Haywood attributes also to the pancreatic juices leaking. And during that exploratory laparotomy, it is clear from the record and the facts that are set out by all parties here, that the patient was in the best condition to have that pancreas addressed. And that was the issue in the case, is whether that pancreas should have been addressed on the 17th and surgically repaired at that time, as it actually was by Dr. Paulson again approximately a month later. So it's the surgical standard of care. We didn't have any qualms, any problems, any allegations that Dr. Haywood failed to get the appropriate consultations or that he didn't do the appropriate testing or any of that. So these other specialties, while involved in the case, were again as a default position because the gastroenterologist, the interventional radiologist, they're all treating this pancreas because it wasn't surgically repaired, and it continued to leak and it continued to have problems all the way until the death of Mr. Hansen, as set forth in Dr. Paulson's report, where he comes in at the very tail end of this hospital stay. And by that time, it's been approximately 60 days, where all of his internal organs have been adhesed together and all kinds of problems. He's got renal failure. He's got sepsis. He's got all kinds of problems. And as a last-ditch effort to try to save him, he did what our experts said was the appropriate thing and took the tail of the pancreas off and took out the spleen. That's what the surgical standard of care required, and it required it a month prior to that, to bring in all of these other expert witnesses and to bring in an interventional radiologist of their own and a gastroenterologist of their own to do more than explain the anatomy or explain what was going on in the record, but rather to say, we agree with what Dr. Haywood was doing. The conservative approach is best. That's where the problem lies, because that's where they blur the distinction between standard of care for surgeons and standard of care for other qualified specialists. What we're asking here is just to have a level playing field. As we know, the Chicago Bulls just got into the playoffs and took their conference title. Now, could they have done that? Every time they went out there, it was 8 on 5 instead of 5 on 5? There's five players on the field. We're looking for a new trial where there's equal amounts, surgeon against surgeon, toe to toe, not all these peripheral players that don't have anything to do with the standard of care for a surgeon. That's essentially what our argument is. Our other arguments are set forth in the brief, but fundamentally with this argument and those set forth in our briefs, we believe that there was an injustice done here and there was an abuse of discretion and the case should be reversed and returned to the trial. Thank you. Thank you. We will be taking the matter under advisement.